**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| TRACY VIOLA, individually and on behalf of all others similarly situated, | Case No. 4:26-cv-00814 |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| COLIBRI GROUP d/b/a MCKISSOCK LLC, | JURY TRIAL DEMANDED |
| Defendant. | |

**CLASS ACTION COMPLAINT**

1. Plaintiff Tracy Viola ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Colibri Group d/b/a McKissock LLC ("McKissock" or "Defendant") to obtain damages, restitution, and injunctive relief from Defendant. Plaintiff makes the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and facts that are a matter of public record.

**NATURE OF THE ACTION**

2. This class action arises out of Defendant McKissock's failures to properly secure, safeguard, encrypt, and/or timely and adequately destroy Plaintiff's and Class Members' sensitive personal identifiable information that it had acquired and stored for its business purposes. This failure to secure and monitor its network resulted in a May 2026 data breach ("Data Breach") of highly sensitive documents and information stored on the computer network of McKissock, an organization that provides online continuing education, licensing, and professional development services to real estate professionals, appraisers, home inspectors, and other licensed professionals across the United States, including Plaintiff and Class Members.

3.      Defendant's data security failures allowed a targeted cyberattack in or about May 2026 to compromise Defendant's network (the "Data Breach") that contained personally identifiable information ("PII" or "the Private Information") of Plaintiff and other individuals ("the Class").

4.      Upon information and belief, on or about May 11, 2026, the threat actor "Deathwatch" successfully breached McKissock's inadequately protected computer systems and accessed and exfiltrated an unknown quantity of highly sensitive customer data. The incident was publicly reported on social media by Dark Web Informer on May 11, 2026. As of the filing of this Complaint, Defendant has not provided any kind of notice to affected individuals.[1]

5.      Ransomware groups like Deathwatch operate by gaining unauthorized access to victim networks, exfiltrating sensitive data, and then extorting their victims by threatening to publish or sell the stolen data on dark web leak sites if a ransom is not paid. Open-source tracking resources such as SOS Ransomware catalogue dozens of such active groups, illustrating the scale and persistence of the threat that organizations like McKissock have a duty to anticipate and defend against.[2]

6.      The types of information that ransomware threat actors of this kind have routinely exfiltrated in their attacks include, but are not limited to, names, birthdates, addresses, Social Security numbers, financial records, customer account credentials, internal corporate data, intellectual property, education and licensing records, payment card and banking details, and other personally identifiable information.

---

[1] https://x.com/DarkWebInformer/status/2054932109270172116 (last visited May 22, 2026).
[2] https://sosransomware.com/en/ransomware-groups/ (last visited May 22, 2026).

7.      The information collected at McKissock in order to receive online continuing education, licensing, exam preparation, or other professional services included certain personal information of current and former customers, including Plaintiff. Upon information and belief, this Private Information, stored on Defendant's computer network, included, but is not limited to full names, addresses, account usernames and passwords, email addresses, telephone numbers, Social Security numbers, government identification information/driver's license numbers, professional licensing information, education and course history, and payment card and financial account information.

8.      Upon information and belief, the cybercriminals intentionally targeted McKissock for the highly sensitive Private Information it stores on its computer network, attacked the insufficiently secured network, then exfiltrated highly sensitive PII, including but not limited to Social Security numbers. As a result, the Private Information of Plaintiff and the Class remains in the hands of those cybercriminals.

9.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect individuals' Private Information with which it was entrusted for business purposes.

10.     Plaintiff brings this class action lawsuit on behalf of themself and all others similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access of an unknown third party and including in that notice precisely what specific types of information were accessed and taken by cybercriminals.

11. Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant McKissock's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

12. Defendant disregarded the rights of Plaintiff's and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members with prompt and full notice of the Data Breach.

13. In addition, Defendant McKissock failed to properly monitor the computer network and systems that housed the Private Information. Had McKissock properly monitored its property, it would have discovered the intrusion sooner rather than allowing cybercriminals unimpeded access over the course of several days to the PII of Plaintiff and Class Members.

14. Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant McKissock collected and maintained is now in the hands of data thieves and upon information and belief disseminated on the dark web.

4

15.     Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

16.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and for years into the future closely monitor their financial accounts to guard against identity theft.

17.     Plaintiff and Class Members may also incur out-of-pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

18.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed during the Data Breach (the "Class").

19.     Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) breach of implied contract, (iii) unjust enrichment, and (iv) declaratory relief.

20.     Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief, including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant, and declaratory relief.

## PARTIES

21.     Plaintiff Tracy Viola is and at all times mentioned herein was an individual citizen of the Commonwealth of Massachusetts, residing in the city of Springfield. Plaintiff Viola was a customer of Defendant McKissock.

22.     Defendant Colibri Group d/b/a McKissock LLC is a limited liability company with its principal place of business at 399 S Spring Ave, Saint Louis, Missouri 63110. It can be served through its registered agent, CSC-Lawyers Incorporating Service Company, located at 221 Bolivar Street, Jefferson City, Missouri 65101.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

24.     The Court has general personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business or business venture in this State; it is registered to do business in Missouri; it maintains its principal place of business in St. Louis, Missouri; and it committed tortious acts in Missouri.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the district within which McKissock maintains its principal place of business and has the most significant contacts, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

6

## FACTUAL ALLEGATIONS

### *Defendant's Business*

26.     Defendant McKissock is a leading nationwide provider of online education for licensed professionals, offering a robust suite of services to real estate agents, appraisers, home inspectors, engineers, land surveyors, and other licensed professionals, including qualifying education, continuing education, license upgrade courses, exam preparation, and professional development. McKissock describes itself as providing the education licensed professionals need to obtain and maintain their licenses and grow in their careers.[3]

27.     McKissock is a wholly owned subsidiary of Colibri Group and, according to its public statements, serves more than 300,000 licensed professionals nationwide and has been a leader in appraisal and real estate education for more than two decades.[4]

28.     In the ordinary course of her relationship as a customer of Defendant McKissock, Plaintiff, like other customers, was required to provide (and did provide) Defendant McKissock with sensitive, personal, and private information, such as their:

- Name, address, phone number, and email address;

- Date of birth;

- Social Security number;

- Professional license number(s) and credentialing information;

- Course enrollment, completion, and continuing education records;

- Demographic information;

- Driver's license or state or federal identification;

---

[3] https://www.mckissock.com/about-us/ (last visited May 22, 2026).
[4] *Id.*

- Account credentials, including usernames and passwords;

- Professional background and employment information; and

- Banking and/or credit card information.

29. McKissock had a duty to adopt reasonable measures to protect Plaintiff's and Class Members' PII from unauthorized disclosure to third parties.

### The Data Breach

30. A data breach occurs when cybercriminals intend to access and steal Private Information that has not been adequately secured by a business entity like McKissock.

31. Upon information and belief, Defendant experienced a cyberattack on its computer systems by the threat actor Deathwatch on or around May 11, 2026, when sensitive customer data was accessed and exfiltrated from McKissock's networked systems. Upon information and belief, the threat actor publicly claimed responsibility for the attack and posted information regarding the exfiltrated data on the dark web for sale/ransom following the Data Breach.[5]

32. Defendant has yet to notify State Attorney Generals of the Data Breach that occurred on or about May 11, 2026.

33. As of the filing of this Complaint, upon information and belief, the required State Attorneys Generals' notices have not been sent, nor have customers and employees received direct notice of whether their Private Information was breached and exfiltrated.

34. Since the Data Breach, according to cybersecurity news sources, the ransomware group Deathwatch has claimed responsibility for the attack and allegedly posted stolen files as proof.

---

[5] https://x.com/DarkWebInformer/status/205493210927017116 (last visited May 22, 2026).

35.     McKissock's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

36.     McKissock knew or should have known that its electronic records would be targeted by cybercriminals.

37.     McKissock had obligations created by FTCA, contract, industry standards, common law, state law, and representations made to Plaintiff and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

38.     McKissock's own Privacy Policy expressly acknowledges its duty to protect the Personal Information of individuals with whom it conducts business. The Policy states that McKissock uses "reasonable security measures, including administrative, technical, and physical safeguards designed to protect against loss, accidental, unlawful, or unauthorized access, use, loss, access, disclosure, alteration, or destruction" of personal information.[6]

39.     Despite these express representations and commitments, Defendant McKissock failed to implement and maintain the very safeguards it promised, directly resulting in the unauthorized access and exfiltration of Plaintiff's and Class Members' sensitive Private Information by the threat actor Deathwatch in May 2026.[7]

40.     Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

---

[6] https://www.mckissock.com/privacy-policy/ (last visited May 22, 2026).
[7] *Id.*

9

***Defendant Acquires, Collects, and Stores Plaintiff's and Class Members' PII.***

41.     McKissock acquires, collects, and stores a substantial amount of personally identifiable information ("PII") of its customers, employees, and other individuals in connection with the online continuing education, licensing, exam preparation, and professional development services it provides to clients throughout the United States.

42.     By obtaining, collecting, and using Plaintiff's and Class Members' PII for its own financial gain and business purposes, Defendant assumed legal and equitable duties and knew that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

43.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

44.     Plaintiff and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### The Data Breach Was a
### Foreseeable Risk of Which Defendant Was on Notice.

45.     It is well known that PII, including Social Security numbers in particular, is a valuable commodity and a frequent, intentional target of cybercriminals. Companies that collect such information, including McKissock, are well aware of the risk of being targeted by cybercriminals.

46.     Individuals place a high value not only on their PII, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

47.     A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research

10

study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket losses and any losses reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[8]

48.     Individuals, like Plaintiff and Class Members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and are likened to accessing one's DNA for a hacker's purposes.

49.     Data breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse.

50.     The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other government agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[9]

---

[8] "Victims of Identity Theft, 2018," U.S. Department of Justice (Apr. 2021, NCJ 256085), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited May 22, 2026).
[9] https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited May 22, 2026).

51.     In 2024, there were a record 3,158 data breaches, similar to the 3,202 breaches reported in 2013. Furthermore, the number of victims affected jumped to 1.73 billion people, which is a 300% increase from 2024 to 2023.[10]

52.     Additionally, "in 2024, healthcare data breaches reached an all-time high, with 276,775,457 compromised – a 64.1% increase from the previous year's record and equivalent to 81.38% of the United States population." In a new report issued, "more than 2,400 security leaders and found that the top predicted threat for 2025 is ransomware. According to the report, nearly 1 out of every 3 security professionals (38%) believe ransomware will become an even greater threat when powered by AI." This is particularly alarming as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from businesses "lack of cybersecurity expertise and significant security resources."[11]

53.     Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

54.     According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data."[12] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't

---

[10]     https://www.cnet.com/tech/services-and-software/near-record-number-of-data-breaches-reported-in-2024-report-says/ (last visited May 22, 2026).
[11]   https://www.forbes.com/sites/chuckbrooks/2025/04/05/key-cybersecurity-challenges-in-2025-trends-and-observations/ (last visited May 22, 2026).
[12] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last visited May 22, 2026).

guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[13]

55. Despite the prevalence of public announcements of data breaches and data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, McKissock failed to take appropriate steps to protect the PII of Plaintiff and the proposed Class from being compromised.

### *At All Relevant Times Defendant Had a Duty to Plaintiff and Class Members to Properly Secure Their Private Information.*

56. At all relevant times, McKissock had a duty to Plaintiff and Class Members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiff and Class Members, and to promptly notify Plaintiff and Class Members when McKissock became aware that their PII was compromised.

57. Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, Defendant breached its common law, statutory, and other duties owed to Plaintiff and Class Members.

58. Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

   a. Maintaining a secure firewall configuration;

   b. Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

---

[13] *Id.*

c.      Monitoring for suspicious or irregular traffic to servers;

d.      Monitoring for suspicious credentials used to access servers;

e.      Monitoring for suspicious or irregular activity by known users;

f.      Monitoring for suspicious or unknown users;

g.      Monitoring for suspicious or irregular server requests;

h.      Monitoring for server requests for PII;

i.      Monitoring for server requests from VPNs; and

j.      Monitoring for server requests from Tor exit nodes.

59.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[14] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[15]

60.     The ramifications of Defendant's failure to keep consumers' PII secure are long lasting and severe. Once PII is stolen, particularly Social Security and driver's license numbers, fraudulent use of that information and damage to victims including Plaintiff and the Class may continue for years.

---

[14] 17 C.F.R. § 248.201 (2013).
[15] *Id.*

*The Value of Personal Identifiable Information*

61.     The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200.[16]

62.     Criminals can also purchase access to an entire company's data breaches for $900 to $4,500.[17]

63.     Social Security numbers, for example, are among the worst kinds of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[18]

64.     Attempting to change or cancel a stolen Social Security number is difficult if not nearly impossible. An individual cannot obtain a new Social Security number without evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a

---

[16] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited May 22, 2026).

[17] *In the Dark*, VPNOverview (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited May 22, 2026).

[18] Soc. Sec. Admin., *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited May 22, 2026).

Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

65.     Even a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[19]

66.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[20]

67.     PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number.  This can be accomplished alone or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[21]

68.     Given the nature of this Data Breach, it is foreseeable that the compromised PII can be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Class Members' PII can easily obtain Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

---

[19] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited May 22, 2026).
[20] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited May 22, 2026).
[21] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n.1 (last visited May 22, 2026).

69.     The Private Information compromised in this Data Breach is static and difficult, if not impossible, to change (such as Social Security numbers).

70.     Moreover, McKissock has failed to promptly notify Plaintiff and Class Members of the Data Breach and failed to offer any identity theft monitoring or protection.

71.     Defendant expects Plaintiff and Class Members to protect themselves from its tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiff and Class Members in credit monitoring services upon discovery of the breach, Defendant merely expects Plaintiff and Class Members to know about actions they can affirmatively take to protect themselves.

72.     The lack of services are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud, and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' PII.

73.     The injuries to Plaintiff and Class Members were directly and proximately caused by McKissock's failure to implement or maintain adequate data security measures for the victims of its Data Breach.

### *Defendant Fails to Comply with FTC Guidelines.*

74.      The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

75.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.  The

guidelines note that businesses should protect the personal consumer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[22] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[23]

76.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

77.    The FTC has brought enforcement actions against businesses, like that of McKissock, for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

78.    These FTC enforcement actions include actions against businesses like Defendant that collect and store consumer personal information. *See, e.g.*, *In the Matter of LabMD, Inc., A*

---

[22] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited May 22, 2026).
[23] *Id.*

*Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

79.     Defendant failed to properly implement basic data security practices.

80.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

81.     Defendant was at all times fully aware of its obligation to protect the PII of its customers and employees. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *Defendant Fails to Comply with Industry Standards.*

82.     As shown above, experts studying cybersecurity routinely identify businesses that collect and store large volumes of consumer PII as being particularly vulnerable to cyberattacks because of the value of the information they maintain.

83.     Several best practices have been identified that at a minimum should be implemented by businesses like Defendant that collect and store consumer PII, including, but not limited to: educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data; and limiting which employees can access sensitive data.

84.     Other best cybersecurity practices that are standard across industries that collect consumer PII include installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network

19

systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; safeguarding communication systems; and training staff regarding critical security practices.

85.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

86.    These frameworks are widely recognized and applicable industry standards for organizations that collect and store sensitive consumer information, yet Defendant failed to comply with these accepted standards, thereby opening the door to and failing to thwart the Data Breach.

### Data Breaches Put Consumers at an Increased Risk Of Fraud and Identity Theft.

87.    Data breaches, such as the one experienced by Plaintiff and the Class, are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

88.    In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[24] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. *See* the GAO chart of consumer recommendations, reproduced and attached

---

[24] https://www.gao.gov/assets/gao-19-230.pdf (last visited May 22, 2026). *See* attached as Ex. A.

20

as Exhibit A. It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiff and the Class) must take after a breach like Defendant's are both time-consuming and of only limited and short-term effectiveness.

89.    The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record," discussing the same in a 2007 report as well ("2007 GAO Report").[25]

90.    The FTC, like the GAO (*see* Exhibit A), recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[26]

91.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

92.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

---

[25] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited May 22, 2026). ("2007 GAO Report").
[26] *See* https://www.identitytheft.gov/Steps (last visited May 22, 2026).

93.     Theft of Private Information is also gravely serious. PII is a valuable property right.[27]

94.     It must also be noted that there may be a substantial time lag – measured in years – between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* 2007 GAO Report, at p. 29.

95.     Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

96.     There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

97.     As the HHS warns, "PHI can be exceptionally valuable when stolen and sold on a black market, as it often is. PHI, once acquired by an unauthorized individual, can be exploited via

---

[27] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3–4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

extortion, fraud, identity theft, and data laundering. At least one study has identified the value of a PHI record at $1000 each."[28]

98.     Furthermore, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[29] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[30] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

99.     Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[31]

100.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card

---

[28] https://www.hhs.gov/sites/default/files/cost-analysis-of-healthcare-sector-data-breaches.pdf at 2 (citations omitted) (last visited May 22, 2026).

[29] *Identity Theft and Your Social Security Number* at 1, Soc. Sec. Admin. (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf (last avisited May 22, 2026).

[30] *Id.* at 4.

[31] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited May 22, 2026).

information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[32]

101.   In recent years, industries that collect and store large volumes of consumer personal information have experienced a disproportionately high number of data theft events. Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## PLAINTIFF'S EXPERIENCES

### *Plaintiff Tracy Viola*

102.   Plaintiff Tracy Viola is and at all times mentioned herein was an individual citizen of the Commonwealth of Massachusetts, residing in the city of Springfield, and was a customer of Defendant McKissock, having purchased online continuing education and professional development courses offered by Defendant.

103.   As a former customer of McKissock, Plaintiff Viola entrusted Defendant with highly sensitive Private Information, including, but not limited to, full name, date of birth, Social Security number, financial account information, driver's license, and home address. In connection with her use of Defendant's services, Plaintiff provided Defendant with this Private Information as required, and upon information and belief, this Private Information was maintained on McKissock's computer systems on or around May 11, 2026, when those systems were subject to unauthorized access and exfiltration by cybercriminals. Plaintiff's Private Information, therefore,

---

[32] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited May 22, 2026).

24

was among the data compromised in the incident. Plaintiff first learned of the Data Breach on or about May 14, 2026, through her own research after noticing an increase in suspicious spam contacts and has not received any direct notification from Defendant to date.

104.    Following the Data Breach, Plaintiff became aware of the incident through her own online research after noticing an increase in unwanted suspicious spam contacts.

105.    Since the Data Breach, Plaintiff monitors her financial accounts for about 1-2 hours per week. This is more time than she spent prior to learning about the McKissock's Data Breach. Having to do this every week not only wastes her time as a result of McKissock's negligence, but it also causes her great anxiety.

106.    Since the Data Breach, Plaintiff has been receiving an excessive number of spam calls, texts, and emails on a daily basis to the same cell phone number and email address provided to McKissock during her time as a customer. These unwanted contacts are a mix of spam calls, texts, and phishing emails. They have occurred daily since approximately two weeks after the breach. Plaintiff has retained records of these contacts and reasonably believes they are directly attributable to the compromise of her Private Information in the Data Breach.

107.    Since the Data Breach, Plaintiff has experienced a significant and ongoing increase in spam and phishing emails sent to the same email address she provided to McKissock during her time as a customer. These emails are persistent, time-consuming to manage, and appear designed to obtain additional personal or financial information. Plaintiff reasonably believes the influx of emails is directly related to the compromise of her Private Information in the Data Breach.

108.    Since learning of the Data Breach, Plaintiff has continued to closely monitor her financial and sensitive accounts through her existing credit and identity monitoring plan,

dedicating additional time each week to vigilance against potential misuse of her Private Information as a result of the Data Breach.

109.    Plaintiff is also aware that her Social Security number, home address, date of birth, and email address may have been compromised and disseminated as a result of the breach. Plaintiff's actions reflect her ongoing concern and anxiety about the continued misuse of her Private Information resulting from the Data Breach.

110.    Plaintiff Viola is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after McKissock's Data Breach.

111.    Had Plaintiff Viola been aware that McKissock's computer systems were not secure, she would not have entrusted McKissock with her PII.

### PLAINTIFF AND CLASS MEMBERS' INJURIES

112.    To date, Defendant McKissock has done absolutely nothing to compensate Plaintiff and Class Members for the damages they sustained in the Data Breach.

113.    Defendant McKissock has yet to offer credit monitoring services, which is inadequate when victims are likely to face many years of identity theft.

114.    McKissock's lack of offer fails to sufficiently compensate victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiff's and Class Members' Private Information, out-of-pocket costs, and the time they are required to spend attempting to mitigate their injuries.

115.    Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

26

116.   Plaintiff's and Class Members' Private Information was compromised and exfiltrated by cybercriminals as a direct and proximate result of the Data Breach.

117.   Plaintiff and the Class were damaged in that their Private Information is now in the hands of cybercriminals, sold, and potentially for sale for years into the future.

118.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft.

119.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

120.   Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses, such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

121.   Plaintiff and Class Members face a substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information, as potential fraudsters could use that information to more effectively target such schemes against Plaintiff and Class Members.

122.   Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss-of-value damages in related cases.

27

123.    Plaintiff and Class Members have spent, and will continue to spend, significant time monitoring their financial accounts and records for misuse.

124.    Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a.   Finding fraudulent charges;

b.   Canceling and reissuing credit and debit cards;

c.   Purchasing credit monitoring and identity theft prevention;

d.   Monitoring their medical records for fraudulent charges and data;

e.   Addressing their inability to withdraw funds linked to compromised accounts;

f.   Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g.   Placing "freezes" and "alerts" with credit reporting agencies;

h.   Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i.   Contacting financial institutions and closing or modifying financial accounts;

j.   Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k.   Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

28

l. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

125. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password-protected.

126. Further, as a result of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

127. Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of PII. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft.  Here, McKissock knew of the breach *since May 11, 2026,* and has not yet notified victims. Yet McKissock offered no explanation of the purpose for the delay. This delay violates notification requirements and increases the injuries to Plaintiff and the Class.

## CLASS ACTION ALLEGATIONS

128. Plaintiff brings this action on behalf of themselfand on behalf of all other persons similarly situated.

29

129. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

All persons whose Private Information was compromised as a result of the Data Breach discovered by Colibri Group d/b/a McKissock LLC in May 2026 (the "Class").

130. Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

131. Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery. The proposed Class meets the criteria for certification.

132. <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiff at this time, but the number of Class Members are believed to be in the thousands.

133. <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

    b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

30

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g. Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i. Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j. Whether Defendant failed to provide notice of the Data Breach in a timely manner; and

k. Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

134. _Typicality_. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach.

135.    <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

136.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

137.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

138.    Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

139.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether Defendant failed to timely notify the public of the Data Breach;

b.    Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c.    Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.    Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

f.    Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

140.    Finally, all Members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION

### First Count
**Negligence**
**(On Behalf of Plaintiff and Class Members)**

141.    Plaintiff incorporates by reference each and every material fact of this Complaint as if fully set forth herein.

142.    Defendant gathered and stored the Private Information of Plaintiff and Class Members as part of the regular course of its business operations. Plaintiff and Class Members were entirely dependent on Defendant to use reasonable measures to safeguard their Private Information and were vulnerable to the foreseeable harm described herein should Defendant fail to safeguard their Private Information.

143.    By collecting and storing this data in its computer property, and sharing it, and using it for commercial gain, Defendant assumed a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a Data Breach.

144.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

145.    Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair ... practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

146.    Plaintiff and the Class are within the class of persons that the FTC Act was intended to protect.

147. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

148. Defendant gathered and stored the Private Information of Plaintiff and Class Members as part of its business of soliciting its services to its customers, which solicitations and services affect commerce.

149. Defendant violated the FTC Act by failing to use reasonable measures to protect the Private Information of Plaintiff and Class Members and by not complying with applicable industry standards, as described herein.

150. Defendant breached its duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiff's and Class Members' Private Information, and by failing to provide prompt notice without reasonable delay.

151. Defendant's multiple failures to comply with applicable laws and regulations constitutes negligence per se.

152. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

153. Defendant had full knowledge of the sensitivity of the Private Information, the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully disclosed, and the importance of adequate security.

154. Plaintiff and Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class Members had no ability to protect their Private Information that was in Defendant's possession.

155. Defendant was in a special relationship with Plaintiff and Class Members with respect to the hacked information because the aim of Defendant's data security measures was to benefit Plaintiff and Class Members by ensuring that their personal information would remain protected and secure. Only Defendant was in a position to ensure that its systems were sufficiently secure to protect Plaintiff's and Class Members' Private Information. The harm to Plaintiff and Class Members from its exposure was highly foreseeable to Defendant.

156. Defendant owed Plaintiff and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining, storing, using, and managing their Private Information, including taking action to reasonably safeguard such data and providing notification to Plaintiff and the Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

157. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* RESTATEMENT (SECOND) OF TORTS § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

158. Defendant had duties to protect and safeguard the Private Information of Plaintiff and the Class from being vulnerable to compromise by taking common-sense precautions when

36

dealing with sensitive Private Information. Additional duties that Defendant owed Plaintiff and the Class include:

a. To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendant's networks, systems, protocols, policies, procedures and practices to ensure that Plaintiff's and Class Members' Private Information was adequately secured from impermissible release, disclosure, and publication;

b. To protect Plaintiff's and Class Members' Private Information in its possession by using reasonable and adequate security procedures and systems; and

c. To promptly notify Plaintiff and Class Members of any breach, security incident, unauthorized disclosure, or intrusion that affected or may have affected their Private Information.

159. Only Defendant was in a position to ensure that its systems and protocols were sufficient to protect the Private Information that had been entrusted to them.

160. Defendant breached its duties of care by failing to adequately protect Plaintiff's and Class Members' Private Information. Defendant breached its duties by, among other things:

a. Failing to exercise reasonable care in obtaining, retaining, securing, safeguarding, protecting, and deleting the Private Information in its possession;

b. Failing to protect the Private Information in its possession using reasonable and adequate security procedures and systems;

c. Failing to adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and store Private Information;

37

d. Failing to adequately train its employees to not store unencrypted Private Information in their personal files longer than absolutely necessary for the specific purpose that it was sent or received;

e. Failing to consistently enforce security policies aimed at protecting Plaintiff's and Class Members' Private Information;

f. Failing to mitigate the harm caused to Plaintiff and the Class Members;

g. Failing to implement processes to quickly detect data breaches, security incidents, or intrusions; and

h. Failing to promptly notify Plaintiff and Class Members of the Data Breach that affected their Private Information.

161. Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

162. As a proximate and foreseeable result of Defendant's grossly negligent conduct, Plaintiff and Class Members have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

163. Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the Private Information of Plaintiff and Class Members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the Private Information of Plaintiff and Class Members while it was within Defendant's possession and control.

164. Further, through its failure to provide timely and clear notification of the Data Breach to Plaintiff and Class Members, Defendant prevented Plaintiff and Class Members from taking meaningful, proactive steps to securing their Private Information and mitigating damages.

38

165.    As a result of the Data Breach, Plaintiff and Class Members have spent time, effort, and money to mitigate the actual and potential impact of the Data Breach on their lives, including but not limited to, responding to the fraudulent use of the Private Information, and closely reviewing and monitoring bank accounts, credit reports, and statements sent from providers and their insurance companies.

166.    Defendant's wrongful actions, inaction, and omissions constituted (and continue to constitute) common law negligence.

167.    The damages Plaintiff and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

168.    Plaintiff and the Class have suffered injury and are entitled to actual damages in amounts to be proven at trial.

**Second Count**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and Class Members)**

169.    Plaintiff incorporates by reference each and every material fact of this Complaint as if fully set forth herein.

170.    Plaintiff and Class Members provided their Private Information to Defendant McKissock in exchange for Defendant's business services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

171.    Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

172. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, and were consistent with industry standards.

173. Plaintiff and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

174. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

175. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

176. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

177. Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

178. As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

179. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

180. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit

to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate long-term credit monitoring to all Class Members.

### Third Count
### Unjust Enrichment
### (On Behalf of Plaintiff and Class Members)

181. Plaintiff incorporates by reference each and every material fact of this Complaint as if fully set forth herein.

182. Plaintiff brings this claim individually and on behalf of all Class Members. This count is plead in the alternative to the breach of contract count above.

183. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and the Class Members.

184. Additionally, because online education and licensing services require identity verification, professional credentialing information, and secure handling of payment and account data, Defendant's business model depends on the collection and use of consumers' Private Information. Defendant profited from Plaintiff's Private Information but failed to provide the data-security protections reasonably expected and required, resulting in unjust enrichment.

185. As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

186. Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and/or its agents and in so doing provided Defendant with their Private Information. In exchange, Plaintiff and Class Members

41

should have received from Defendant the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

187. Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

188. In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

189. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

190. Defendant failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

191. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

192. If Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

193.    Plaintiff and Class Members have no adequate remedy at law.

194.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

195.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

196.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

**Fourth Count**
**Declaratory Judgment**
**(On Behalf of Plaintiff and Class Members)**

197. Plaintiff incorporates by reference each and every material fact of this Complaint as if fully set forth herein.

198. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

199. An actual controversy has arisen in the wake of the Defendant's Data Breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' Personal Information and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their Private Information.

200. Plaintiff alleges that Defendant's data security measures remain inadequate. Plaintiff will continue to suffer injury because of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

201. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

   a. Defendant continues to owe a legal duty to secure customers' Private Information and to timely notify customers of a data breach under the common law, state law, Section 5 of the FTC Act, and various states' statutes; and

b.      Defendant continues to breach this legal duty by failing to employ reasonable measures to secure customers' Private Information.

202.    The Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect customers' Private Information.

203.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiff and Class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

204.    The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another massive data breach occurs at Defendant, Plaintiff and Class Members will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has pre-existing legal obligations to employ such measures.

205.    Issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and the thousands of individuals whose Private Information would be further compromised.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a) For an Order certifying this action as a class action and appointing Plaintiff and their counsel to represent the Class;

b) For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c) For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e) Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

f) For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

h) Pre- and post-judgment interest on any amounts awarded; and

i) Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

46

Dated: May 22, 2026                           Respectfully submitted,


                                              */s/ Danielle L. Perry*
                                              Danielle L. Perry
                                              Ra O. Amen
                                              **MASON & PERRY LLP**
                                              5335 Wisconsin Avenue NW, Ste. 640
                                              Washington, DC 20015
                                              Tel: (202) 429-2290
                                              Email: dperry@masonllp.com
                                              Email: ramen@masonllp.com

                                              *Attorneys for Plaintiff*